IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

STEVE SANCHEZ,

      Plaintiff,                       No. CIV S-07-0542 MCE EFB P

    vs.

MONTE PENNER,

      Defendants.              ORDER AND
                                          FINDINGS AND RECOMMENDATIONS

_____/

      Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C. § 1983.  Plaintiff claims that Dr. Penner failed to immediately and properly treat plaintiff's infection and that the failure violated plaintiff's Eighth Amendment rights.  Plaintiff also claims that this alleged failure deprived plaintiff of a federally protected liberty interest under the Fourteenth Amendment and violated Cal. Gov't Code § 845.6 and Cal. Penal Code § 2652 .

      Dr. Penner has moved for summary judgment.  For the reasons explained below, the motion must be granted.

**I.    Facts**

      At all times relevant to this action, plaintiff was a prisoner at California State Prison, Sacramento.  Defendant Dr. Penner was a physician there.  Def.'s Mot. for Summ. J., Attach. 4,

1

Decl. of Penner ("Penner Decl."), ¶ 1.[1]

**A. Background Facts**

Defendant Penner describes in his declaration his role in the prison medical system and how prisoners may obtain access to medical care. He describes his position as "staff physician and surgeon" in which he was to "provide appropriate health care within the scope of my license." Penner Decl., at ¶ 2-3. Significantly here, he did not supervise nurses or pharmacy staff. *Id.* at ¶ 3. Pharmacy staff were responsible for processing prescriptions and providing medication to medical staff for distribution to prisoners. *Id.* Penner asserts that as a staff physician, he was "assigned to a 'yard'[2] and work[ed] at the yard clinic on assigned days and shifts." *Id.*, at ¶ 4. Thus, he saw any prisoner who went to the clinic during his shift. *Id.* Dr. Penner asserts that it was the policy and procedure of the California Department of Corrections and Rehabilitation ("CDCR") and California State Prison, Sacramento that staff physicians were not "assign[ed] . . . to an inmate to continuously monitor that particular inmate's medical care." *Id.* Plaintiff, however, asserts that Dr. Penner was his chronic care physician; and, therefore, he was responsible for treating plaintiff's epilepsy, asthma and other medical conditions that require ongoing monitoring and treatment.[3] Plaintiff's Deposition, lodged September 22, 2008 ("Pl.'s Dep."), at 21.

Prisoners could obtain medical care in several ways. They could complete a written form[4] provided by the prison, appear at the "Medical Doctors line," which is available in the

---

[1] Dr. Penner no longer works for the California Department of Corrections and Rehabilitation. Penner Decl., ¶ 1.

[2] A "yard" is a group of housing units where prisoners live. Penner Decl., at ¶ 4.

[3] It appears that there is no meaningful distinction between the parties' positions on this point. If Dr. Penner was the general physician for all prisoners on plaintiff's yard, then by default he was responsible for managing plaintiff's daily care. This does not exclude the possibility that Dr. Penner's only role on any given day would be to refer plaintiff to a specialist.

[4] This form is known as a "Request for Health Care Services." Penner Decl., at ¶ 4.

morning, express the need to a guard, a Medical Technical Assistant ("MTA"), or a registered nurse ("RN") during pill call, or file an administrative appeal. Penner Decl., at ¶ 4. Plaintiff asserts that prisoners who wanted to go to the medical clinic without making a request could do so while on the exercise yard. Am. Compl., at 3.

Plaintiff has submitted evidence about the medical condition for which he sought treatment. He was diagnosed with cellulitis.[5] Pl.'s Opp'n, Ex. A, at 16. Plaintiff's evidence shows that cellulitis is a "potentially serious bacterial infection" of the skin. *Id.* It "appears as a swollen, red area of skin that feels hot and tender, and it may spread rapidly." *Id.* Untreated, "the spreading bacterial infection may rapidly turn into a life-threatening condition." *Id.* Plaintiff also has submitted evidence that as late as 2007, many prison physicians prescribed Keflex for skin infections, including MRSA,[6] but the medication was not helpful for skin infections in general, and permitted "prolonged infection and increased opportunities for the infection to grow."[7] Pl.'s Opp'n, Ex. A, at 54.

The court now turns to the events giving rise to this action.

**B.  Events Relevant to this Action**

As will become apparent, one dispute before the court is whether Dr. Penner diagnosed plaintiff as suffering from a bug bite or from cellulitis. There is no information about whether or

---

[5] This information is on a printout which purports to be from the Mayo Clinic website, at http://www.mayclinic.com/health/cellulitis/DS00450. Defendant Dr. Penner does not dispute the accuracy of the information contained in this printout. The court has visited this web site and verified that the information plaintiff has submitted is contained on that site. Accordingly, the court takes judicial notice of the fact that this evidence is from the Mayo Clinic web site. *See* Fed. R. Ev. 201(b), (c).

[6] Throughout his papers, plaintiff refers to MRSA, which is "methicillin resistant staphylococcus aureus." Pl.'s Opp'n, Ex. A, at 53. As the name implies, MRSA is caused by the bacteria staphylococus aureus.

[7] Interestingly, there is a section of the Mayo Clinic website upon which plaintiff relies called, "Treatments and drugs," that identifies Keflex as a medication commonly prescribed for cellulitis. http://www.mayoclinic.com/health/cellulitis/DS00450/DSECTION   This is so because it is effective against two kinds of bacteria, i.e., streptococci and staphyloccoci. *Id.*

1  how treatment of a bug bite differs from that of cellulitis.

2  On the morning of Friday, January 20, 2006, plaintiff's right hand was swollen and
3  discolored, and he was in a great deal of pain. Am. Compl., at 3.[8]  He complained to a medical
4  technical assistant, who told him to complete a written request for medical attention, which he
5  did. *Id.* Plaintiff wrote, "[t]he back of my hand, from the tips of my fingers to my wrist is
6  extremely swollen and red." Pl.'s Opp'n, Ex. A, at 4.  On this form, the MTA noted that the
7  swelling began "a couple days ago," and noted that plaintiff speculated that perhaps an insect
8  bite caused the swelling. *Id.*  When plaintiff was released to the exercise yard that day, he
9  requested permission to enter the clinic. *Id.*  An unidentified prison employee denied him entry.
10 *Id.*  There is no evidence about the reason for this denial.  In an attempt to ease the pain in his
11 hand, plaintiff began taking high doses of Motrin. *Id.* at 3-4.

12 The next morning, Saturday, January 21, 2006, the swelling and pain in plaintiff's hand
13 had worsened. Am. Compl., at 4.  While on the exercise yard, plaintiff showed his hand to a
14 guard and requested access to the medical clinic. *Id.*  This guard escorted plaintiff to the clinic
15 emergency room. *Id.*  There, Mr. Brebeck, an attendant who was not a physician, examined
16 plaintiff's hand and wrist. *Id.* at 4.  Brebeck told plaintiff that it appeared plaintiff had an
17 infection, but that he could not prescribe medications. *Id.*  He told plaintiff to return to the clinic
18 on Monday when a doctor would be there. *Id.*  By Sunday morning, the swelling in plaintiff's
19 hand was so bad that he could not straighten his fingers, and his hand and wrist were red. *Id.* at
20 4-5.  Once again, a guard escorted plaintiff to the medical clinic. *Id.* at 5.  Plaintiff showed his
21 hand to Brebeck and explained that he was taking Motrin he had obtained from other prisoners.
22 *Id.*  Brebeck advised plaintiff that he was taking too much Motrin and told plaintiff to return to
23 the clinic Monday, when a doctor would be available. *Id.* at 5-6.

---

[8] Plaintiff's complaint is verified and specific enough for the court to treat it as an affidavit. *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995); *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987).

4

On Monday, January 23, 2006, plaintiff saw Dr. Wedell[9] in the medical clinic. Pl.'s Opp'n, Ex. A, at 6. Plaintiff complained of "high levels" of pain. *Id.* Plaintiff told Dr. Wedell that on January 19, 2006, he fell from an upper bunk after having a seizure. *Id.* Dr. Wedell noted that plaintiff speculated that he might have been bitten by a spider. *Id.* In light of plaintiff's report that he had fallen from his bunk, Dr. Wedell prescribed Tylenol and an ice pack for pain, and directed that plaintiff keep his hand elevated above his head in order to reduce swelling. *Id.* at 7. Later that day, plaintiff returned to the medical clinic. This time, Dr. Penner examined him. Am. Compl. at 7; Penner Decl., at ¶ 6.

At deposition, plaintiff testified that he told Dr. Penner about his initial symptoms and how they had progressed. Dr. Penner noted that plaintiff "had no apparent distress," but his right hand and his third metacarpal were swollen." Penner Decl., at ¶ 6. Dr. Penner also noted that plaintiff had only 30% range of motion of the third metacarpal bone.[10] *Id.* In his complaint and at deposition, plaintiff asserted that Dr. Penner diagnosed plaintiff as suffering from a bad reaction to an insect bite. Compl., at 7-8; Pl.'s Dep., at 24. Nothing in the record suggests that Dr. Penner thought that plaintiff may have suffered a bug bite. In his declaration, Dr. Penner explains that he believed plaintiff had cellulitis. Penner Decl., at ¶ 6. Attached to his declaration is a medical record showing that on January 23, he noted that plaintiff had cellulitis. Penner Decl., Ex. A. The parties agree that Dr. Penner prescribed Keflex, which Penner asserts is an antibiotic used to treat bacterial skin infections. Am. Compl., at 8; Pl.'s Dep., at 24; Penner Decl., at ¶ 6 & Ex. B. Dr. Penner explained that the medication would treat the swelling and the pain, and said that the medication would be available to plaintiff in the evening "pill-call." Am. Compl., at 8. However, the medication was not then available to plaintiff. Am. Compl., at 8-9; Pl.'s Dep., at 29-30.

---

[9] Plaintiff named Dr. Wedell as a defendant. However, the court dismissed all claims against this defendant on the ground that plaintiff failed to exhaust the available administrative remedies with respect to claims against him. Dckt. No. 26.

[10] Defendant does not explain which bone this is.

5

In fact, it was not given to plaintiff during the pill calls on January 24 or 25, either. Am. Compl., at 9-10. This was the case even though Dr. Penner's January 23, 2006, prescription shows that a nurse, whose signature is illegible, wrote "Pharmacy," and dated it "1-23-06." Penner Decl., at ¶ 6 & Ex. B. Dr. Penner explains that this dated notation means that the nurse submitted the order to the pharmacy. Penner Decl., at ¶ 7. Plaintiff does not submit any evidence contesting this fact.

On January 25, 2006, plaintiff made a brief written request for medical attention, on which he wrote, "Swollen hand - help!!" Pl.'s Opp'n, Ex. A, at 9. Based on this request, plaintiff went to the medical clinic, where Dr. Wedell prescribed a sling for plaintiff to elevate his arm, ice to decrease the swelling and Tylenol for pain. *Id*. at 10. On the morning of Thursday, January 26, 2006, plaintiff returned to the medical clinic because the pain and swelling had spread from his right hand into his wrist and forearm. Am. Compl., at 11-12. Mr. Bax, an MTA, examined plaintiff and noted that plaintiff might be suffering from a systematic Staph infection. Am. Compl., at 12; Pl.'s Dep., at 34-35. Later that day, Dr. Penner again examined plaintiff and learned that plaintiff had not been given Keflex until that morning. Penner Decl., ¶ 8; Pl.'s Opp'n, Ex. A, at 11. He noted that plaintiff's right hand was "moderately swollen and he could not flex or extend well." Penner Decl., at ¶ 8. Plaintiff's wrist was slightly red and the swelling extended to his wrist. *Id.*; Pl.'s Opp'n, Ex. A, at 11 (emphasis in original). Dr. Penner still believed that plaintiff had cellulitis. Am. Compl., at 13; Penner Decl., ¶ 8 & Exs. C, D. He ordered Tylenol with codeine to teat the pain. Am. Compl. at 13; Pl.'s Opp'n, Ex. D. He also prescribed Keflex but doubled the dosage, directing that it be given "<u>now</u>." Penner Decl., ¶ 8 & Ex. C (emphasis in medical record); Pl.'s Opp'n, Ex. A, at 11. Dr. Penner was concerned that the infection was spreading, but he believed that immediate administration of the increased Keflex dosage would be an effective treatment and prevent the infection from spreading. Penner Decl., at ¶ 8. Dr. Penner also ordered plaintiff to report to the emergency room the next day between 12:00 p.m. and 2:00 p.m., and noted in plaintiff's medical record that he was to be paged so that he personally could examine plaintiff again. Penner Decl., at ¶ 9; Pl.'s Opp'n, Ex. A, at 12. Dr. Penner wanted to

ensure that the infection had stabilized. *Id.* After re-examining plaintiff, Dr. Penner planned to take appropriate action. Dr. Penner believed that the following options likely would exist after examining plaintiff again: (1) continue the Keflex; (2) substitute a different medication for the Keflex; (3) order further testing; or (4) hospitalization. *Id.*

By Friday, January 27, 2006, the infection had spread to plaintiff's elbow. Am. Compl., at 14. On that date, he returned to the medical clinic, where he was examined by Dr. Borges. *Id.*, at 14-16. Dr. Borges discontinued the Keflex. Am. Compl., at 18-19; Pl.'s Dep., at 46; Pl.'s Opp'n, Ex. A, at 13. Plaintiff asserts Dr. Borges explained that Keflex could aggravate a severe skin infection. Am. Compl., at 19-20. Medical records show that Dr. Borges diagnosed plaintiff with cellulitis. Pl.'s Opp'n, Ex. A, at 13-14. He prescribed Vicodin for pain, an immediate injection of an antibiotic, and a course of Clindamycin and Septra. Pl.'s Dep., at 50; Pl.'s Opp'n, Ex. A, at 13-14. He also requested that plaintiff be examined at an outside hospital. Am. Compl., at 20; Pl.'s Opp'n, Ex. A, at 14. At the hospital, a physician noted that plaintiff had moderate pain, swelling and tenderness that was exacerbated by movement and relieved by rest. Pl.'s Opp'n, Ex. A, at 17. Plaintiff's range of motion was limited and the affected area was warm to the touch. Pl.'s Opp'n, Ex. A, at 18. He diagnosed plaintiff as having cellulitis, and prescribed a five day course of Vicodin, Bactrim DS and an ace bandage. Pl.'s Dep., at 47; Pl.'s Opp'n, Ex. A, at 1-20. A medical record dated January 31, 2006, on which the signature is illegible, notes that plaintiff's right hand still was red and swollen, but plaintiff's condition had improved since January 27. Pl.'s Opp'n, Ex. A, at 21. The author also noted that plaintiff probably had MRSA in his right hand. *Id.* On February 7, 2006, a physician found that plaintiff had improved, but still suffered stiffness in his third metacarpal. *Id.*, at 24. He ordered an x-ray. *Id.* On February 21, 2006, a physician noted that x-rays revealed no abnormalities, and ordered that plaintiff see an orthopedic specialist for his right hand as a result of the cellulitis. *Id.*, at 27.

Around March 1, 2006, plaintiff was transferred to Mule Creek State Prison ("MCSP"), where physical therapists informed him that the infection had caused damage to the ligaments and

soft tissue of his right hand and wrist. Am. Compl., at 22; Pl.'s Opp'n, Ex. A, at 30.

## II.     Evidentiary Objections

Defendant's reply contains objections to documentary evidence plaintiff submitted with his opposition. Def.'s Reply, at 2-4. He objects that plaintiff has submitted witness statements that are unsworn and unsigned, fifteen pages of amendments to plaintiff's deposition, medical records that are not authenticated, some of which are dated after Dr. Penner last treated plaintiff, and documents containing inadmissible hearsay. For the reasons explained, some objections are sustained and some are overruled.

Defendant objects that the unsworn statements of plaintiff's fellow prisoners, which are attached to plaintiff's opposition, do not comply with Rule 56(e). Plaintiff's evidence and defendants' objections cannot be divorced from the nature of this proceeding, i.e., summary judgment, in which defendants are the moving parties. *See Burch v. Regents of the University of California*, 433 F. Supp.2d 1110, 1118-1124 (E. D. Cal. 2006). The portion of the rule governing such a motion supported by affidavits and records provides that the affidavits "shall set forth such facts as would be admissible in evidence . . . ." Fed. R. Civ. P. 56(e). On summary judgment, the non-moving party's evidence need not be in a form that is admissible at trial. *See Burch*, 433 F. Supp.2d at 1119 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Instead, a court is concerned with the admissibility of the contents of the evidence. *Id.* Thus, on summary judgment, "objections to the *form* in which the evidence is presented are particularly misguided where, as here, they target the non-moving party's evidence." *Id*. Accordingly, as long as a party submits evidence which, regardless of its form, may be admissible at trial, it may be considered on summary judgment. *Id.* at 1120. Defendant is correct that the unsigned, unsworn statements plaintiff submits which purport to contain the observations of fellow prisoners cannot be considered. As explained below, the court may consider all affidavits and discovery on file in deciding whether to render a summary judgment. Fed. R. Civ. P. 56(c). The statements of plaintiff's fellow-prisoners are not affidavits because they are not properly sworn

8

and they do not comply with the federal statute governing declarations under the penalty of perjury. *See* 28 U.S.C. § 1746(2) (requirements for unsworn statements to constitute a declaration carrying the full force of a sworn statement)*; see also Williams v. Pierce Co. Bd. of Comm'rs*, 267 F.2d 866, 867 (9th Cir. 1959) (where individual making a written statement has not taken any oath or sworn to the statement, the statement is not an affidavit). Since the only discovery which may be had of a non-party is a deposition, *see* Fed. R. Civ. P. 26-37, which these statements clearly are not, these statements are not discovery either. Thus, they do not fall into any category of materials the court may consider on summary judgment. Accordingly, the objection is sustained. The court will not consider the statements of prisoners contained in plaintiff's Exhibit A attached to his opposition.

Attached as Exhibit C to plaintiff's opposition to defendant's motion is a copy of plaintiff's deposition on which plaintiff made handwritten notations. Defendant objects that the handwritten notations are not properly before the court on summary judgment.[11] The objection is well-taken. The handwritten notations are not part of his deposition. Neither do they amount to any sort of sworn statement. Thus, the notations are not properly before the court. Defendant's objection is sustained.

The court now turns to defendant's objection that the medical records upon which plaintiff relies lack a proper foundation or authentication. In order properly to support or oppose summary judgment, the party relying on affidavits and records must lay a proper foundation. *Beyne v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). The court agrees that "whether the authentication requirement should be applied to bar evidence when its authenticity is not actually disputed is, however, questionable." *Burch*, 433 F.Supp.2d at 1120. "[W]here the objecting party does not contest the authenticity of the evidence submitted, but nevertheless

---

[11] It appears that plaintiff sent to the court reporter a long list of corrections he wished to make to his deposition. Pl.'s Opp'n, Ex. C. He alleges that these corrections were not made. Plaintiff did not notify the court of this while discovery was open. The court cannot now address whether redress is necessary because discovery is closed.

1 makes an evidentiary objection based on purely procedural grounds," then the court should
2 consider the evidence. *Id.* In such a situation, it would appear equally probable that the
3 documents are what they purport to be as it is that they are not. *See Id.*

4 Here, defendant does not actually contest the authenticity of the documents plaintiff has
5 submitted. Defendant's general objection is particularly suspect because all the documents
6 plaintiff submits would find their source in the prison system, either in plaintiff's files or in the
7 prison bureaucracy. Thus, if there were a valid basis for contesting their authenticity, defendant
8 could unearth and present it. But they have not. Therefore, all defendant's objections for lack of
9 proper foundation and lack of authentication are overruled.

10 Defendant also objects that medical records dated after plaintiff obtained medications
11 effective to treat his severe infection are not relevant. Plaintiff, however, alleges that the failure
12 effectively to treat the infection before it became severe caused lasting injury and seeks damages
13 therefor. These records are relevant to his demand for damages. Defendant's objection on the
14 ground of relevance is overruled.

15 Defendant also objects that the bulk of plaintiff's evidence constitutes inadmissible
16 hearsay. This objection is overruled for two reasons. The first is the form of the objection and
17 the second is the nature of the non-moving party's burden on summary judgment. The objections
18 are *pro forma* in that defendant objects to entire documents, not particular statements. An
19 objection based on hearsay inherently is bound to the context in which the allegedly objectionable
20 evidence is offered. *See Burch*, 433 F. Supp.2d at 1122 ("even seemingly appropriate objections
21 based on hearsay and failures to authenticate/lay a foundation are difficult to address away from
22 the dynamics of trial.") Insofar as a letter or record may on its face constitute hearsay, the
23 particular statements upon which plaintiff relies may very well either be admissible nonetheless
24 or may not be hearsay, depending on the purpose for which plaintiff offers the statement. "The
25 court is not inclined to comb through these documents, identify potential hearsay, and determine
26 if an exception applies - all without guidance from the parties." *Id.* at 1124. Thus, to prevail on a

hearsay objection, defendants must object to particular statements and explain the objection. Defendant's failure to do so is sufficient basis for overruling the objection.

With respect to the nature of this proceeding, "the court cannot ignore the fact that a non-movant in a summary judgment setting is not attempting to prove its case, but instead seeks only to demonstrate that a question of fact remains for trial." *Burch*, 433 F. Supp.2d at 1121. The court thus "treat[s] the opposing party's papers more indulgently than the moving party's papers." *Id.* (citing *Lew v. Kona Hosp.,* 754 F.2d 1420, 1423 (9th Cir. 1985)).  While a court need not ignore the evidentiary ramifications of a declaration based nearly entirely on hearsay, *see Burch*, 433 F. Supp.2d at 1121 (noting that the Ninth Circuit does not uniformly apply the principle of indulgence), it is worth pointing out that plaintiff proceeds without counsel.  Furthermore, he does not rely on evidence which on its face presents evidentiary obstacles which would prove insurmountable at trial. *See Id.* at 1122 (noting that at trial, "when a party raises valid evidentiary objections, the opposing party will have an opportunity to present the evidence in an alternative and admissible form.").  Insofar as there may be valid hearsay objections, they are better left for trial, if there is to be one.

Defendant's hearsay objections are overruled for the present time.

## III.     Summary Judgment Standards

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Summary judgment avoids unnecessary trials in cases with no genuinely disputed material facts. *See Northwest Motorcycle Ass'n v. United States Dep't of Agric.,* 18 F.3d 1468, 1471 (9th

Cir. 1994). At issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, Rule 56 serves to screen the latter cases from those which actually require resolution of genuine disputes over material facts, e.g., issues that can only be determined through presentation of testimony at trial such as the credibility of conflicting testimony over facts that make a difference in the outcome. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Focus on where the burden of proof lies as to the issue in question is crucial to summary judgment procedures. "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the opposing party must establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To overcome summary judgment, the opposing party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the claim under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). In this regard, "a complete failure of proof concerning an essential element of the nonmoving party's case

12

necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  In attempting to establish the existence of a factual dispute that is genuine, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.

Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).  However, the opposing party must demonstrate with adequate evidence a genuine issue for trial. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989).  The opposing party must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.  If the evidence presented could not support a judgment in the opposing party's favor, there is no genuine issue. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. at 323.

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could

not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

On June 8, 2007, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

**IV. Analysis**

Plaintiff asserts four claims against Dr. Penner premised on the alleged failure to treat plaintiff's infection immediately and properly. Those claims are brought under the Eighth and Fourteenth Amendments and Cal. Gov't Code § 845.6 and Penal Code § 2652.

**A. Eighth Amendment Claim**

Prison officials violate the Eighth Amendment when they are deliberately indifferent to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A serious medical need is one that significantly affects an individual's daily activities, an injury or condition a reasonable doctor or patient would find worthy of comment or treatment, and chronic and substantial pain. *See*, *e.g.*, *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.2d 1133, 1136 (9th Cir.1997) (*en banc*) A prison official is deliberately indifferent when he knows of and disregards a risk of injury or harm that "is not one that today's society chooses to tolerate. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference may be shown by the denial, delay or intentional interference with medical treatment or by the way in which medical care is provided. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). Prison personnel risk Eighth Amendment liability if they knowingly prescribe specifically contraindicated medications, fail to treat a known, serious medical condition or ignore a physician's prescribed treatment. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989); *Hunt v. Dental Dep't*, 865 F.2d 198, 201 (9th Cir. 1989); *Wakefield v. Thompson*, 177 F.3d 1160 (9th Cir. 2003). Negligence in diagnosing or treating a

14

medical condition, does not violate a prisoner's Eighth Amendment rights. *Hutchinson*, 838 F.2d at 394.

Here, there is no dispute that plaintiff had a serious medical need.[12]  Rather, the issue is whether Dr. Penner's treatment, or delay in treatment of plaintiff's condition fell so far below medically acceptable standards that it effectively constituted deliberate indifference to a known medical condition.  Plaintiff's claim focuses on Dr. Penner's treatment beginning January 23, 2006.  Plaintiff challenges two aspects of his treatment.  First, he contends that Dr. Penner misdiagnosed the condition, prescribed the wrong medication, and delayed administration of the required medication.  Second, plaintiff contends that Dr. Penner was deliberately indifferent to plaintiff's pain.

### 1. **Diagnosis and Treatment of the Infection**

Plaintiff asserts that the misdiagnosis resulted in the wrong of choice of medication based on that misdiagnosis.  He claims that Dr. Penner believed that plaintiff suffered from a bug bite.  As noted above, the evidence currently before the court does not support this assertion.  Dr. Penner's evidence shows that on January 23, 2006, the first time he examined plaintiff, he diagnosed plaintiff with cellulitis and prescribed Keflex.  Plaintiff has not submitted any medical records suggesting that Dr. Penner ever opined that a bug bite caused plaintiff's symptoms, much less based his choice of medications on such a diagnosis.  Absent any evidence upon which a reasonable jury could resolve the issue in plaintiff's favor, there is no genuine dispute about whether Dr. Penner misdiagnosed plaintiff as having suffered from a bug bite and then based the course of treatment on this misdiagnosis.

////

---

[12] A medical condition that significantly affects an individual's daily activities, an injury or condition a reasonable doctor or patient would find worthy of comment or treatment, and chronic and substantial pain constitute serious medical needs. *See, e.g.*, *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.2d 1133, 1136 (9th Cir.1997) (*en banc*).  defendant does not contest the fact that plaintiff's condition required medical attention.

15

The more complicated question is whether Dr. Penner was deliberately indifferent to the infection by prescribing Keflex to treat it. Here, the crucial inquiry is whether that Keflex was contraindicated for his condition and, if so, whether Dr. Penner knew this fact yet prescribed it anyway. *See Jackson v. McIntosh,* 90 F.3d 330, 331 (9th Cir. 1996)(where plaintiff disagrees with treatment provided, he must demonstrate defendant knowingly took action that was contraindicated). Plaintiff contends that Dr. Borges' January order substituting a different medication for Keflex demonstrates that Dr. Penner was deliberately indifferent. In support of his contention, plaintiff asserts that when Dr. Borges prescribed a different antibiotic, he explained that the wrong antibiotic can aggravate a severe infection. However, it is undisputed that both Doctors Penner and Borges diagnosed plaintiff with cellulitis.[13] Further, there is evidence that cellulitis is a skin infection susceptible to treatment by antibiotics, including Keflex. There is no evidence that Keflex was contraindicated on January 23, when Dr. Penner initially prescribed it. Neither is there any evidence that Keflex was contraindicated for plaintiff's condition on January 23 or 26, 2006. Insofar as plaintiff's condition worsened because he was not given the Keflex for several days after it was ordered, there is no evidence that Dr. Penner is responsible for that delay. It is undisputed that once a physician orders a medication and submits the information to a nurse, processing the order and dispensing the medication are outside the physician's control. On January 23, 2006, Dr. Penner ordered Keflex and a nurse noted that fact. Dr. Penner's uncontested evidence shows that he had no reason to believe plaintiff had not received his medication. When Dr. Penner did see plaintiff on January 26, 2006, he doubled the amount of Keflex plaintiff was to take and directed that it be administered immediately. He also ordered plaintiff to return to the emergency room the following day so that he could verify the medication was working. There is no evidence that Dr. Penner knew or inferred that Keflex was

---

[13] While the diagnosis of MRSA crept into plaintiff's medical records as the infection progressed, there is no evidence to distinguish severe cellulitis from MRSA, except to note that the bacteria which causes MRSA resists treatment.

16

contraindicated at any stage of the infection and prescribed it anyway. Accordingly, there is no genuine dispute about whether Dr. Penner was deliberately indifferent in his treatment of plaintiff's infection.

### 2. **The Pain**

As noted, plaintiff also claims that Dr. Penner was deliberately indifferent to plaintiff's pain. Plaintiff argues that Dr. Borges' January 27, 2006, prescription for Vicodin shows that Dr. Penner was deliberately indifferent in the way he treated plaintiff's pain. Again, Dr. Penner contends that plaintiff cannot adduce sufficient evidence to establish a genuine issue for trial.

It is undisputed that Dr. Penner knew on January 23, 2006, that plaintiff was in pain. It also is undisputed that on January 23, 2006, Dr. Penner believed that Keflex would reduce the swelling, and thereby reduce the pain. Dr. Penner did not simply ignore the complaints of pain. Rather, he addressed the pain with more conservative treatment methods which plaintiff criticizes. But there was at least some basis for Dr. Penner's choice and plainly he was not indifferent to the pain. Dr. Penner arrived at his treatment decision after plaintiff recounted the relevant medical history up to that moment, i.e., his initial symptoms, how they had progressed, and Dr. Wedell's ordering regular Tylenol for pain. There is no evidence that Dr. Penner discontinued the regular Tylenol prescribed by Dr. Wedell. Neither is there any evidence that Tylenol combined with the anticipated reduction in swelling from the Keflex was insufficient to treat plaintiff's pain. Therefore, based on the evidence in the record, there is no genuine dispute about whether Dr. Penner knew plaintiff's pain could have been treated more effectively.

As noted, when Dr. Penner saw plaintiff on January 26, he prescribed Tylenol with codeine for pain. There is no evidence that this Tylenol was ineffective. Neither is there any evidence that if it was ineffective, Dr. Penner knew of or inferred this fact, but failed to take additional, reasonable measures to alleviate plaintiff's pain. Without any such evidence, there is no genuine issue about whether Dr. Penner was deliberately indifferent to plaintiff's pain and defendant's motion must be granted on this claim.

### B. Due Process

Plaintiff claims that the suffering caused by Dr. Penner's alleged deliberate indifference deprived plaintiff of due process. The claim is subsumed by the Eight Amendment claim.

To state a claim for violation of the Due Process Clause of the Fourteenth Amendment, a plaintiff must allege a defendant denied plaintiff a specific right protected by the federal constitution without procedures required by the constitution to ensure fairness, or deliberately abused his power without any reasonable justification in aid of any government interest or objective and only to oppress in a way that shocks the conscience. *Sandin v. Connor*, 515 U.S. 472, 483-84 (1995); *Daniels v. Williams*, 474 U.S. 327, 31 (1986); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). The Due Process Clause of the Fourteenth Amendment governs when a person is deprived of a federally protected interest not protected directly by a different constitutional provision. *Graham v. Connor*, 490 U.S. 386, 394 (1989). Here, there is a specific constitutional provision which protects plaintiff from governmental abuse in the realm of medical care, i.e., the Cruel and Unusual Punishments clause of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Accordingly, his attempt to present this dispute over adequacy of medical care by reference to the Due Process Clause of the Fourteenth Amendment is barred. Thus, defendant's motion must be granted with respect to this claim.

Finally, and alternatively, for the reasons discussed *supra*, there in no evidence to establish a genuine dispute that Dr. Penner was deliberately indifferent to any of plaintiff's medical conditions.

### C. Qualified Immunity

Because the court resolves the summary judgment motion relating to the merits in favor of defendants, there is no reason to consider the defense of qualified immunity. *See Wilkie v. Robbins*, 551 U.S. 537, 127 S.Ct. 2588, 2608 (2007).

////

**D. State Law Claims**

Plaintiff asserts two supplemental state law claims. He seems to claim that Dr. Penner's failure immediately and properly to treat plaintiff's condition constituted both medical malpractice and a criminal act. *See* Cal. Gov't Code § 845.6; Cal. Penal Code § 2652. Because the federal question claims are being resolved on summary judgment, the court concludes that it is appropriate to decline supplemental jurisdition over these two state claims. A district court may decline to exercise supplemental jurisdiction over state law claims when it has "dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c). Indeed, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of the applicable law." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966). In deciding whether to dismiss the state law claims, the court must consider "the values of economy, convenience, fairness and comity." *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988). Here, plaintiff's claims are governed by California's medical malpractice law. Therefore, they are subject to proof by reference to elements and standards which are distinct from federal law. California's courts are better prepared to adjudicate the claims with dispatch, and California has a greater interest in administering its medical malpractice law than does the federal government. Accordingly, the court finds that plaintiff's claims arising under state law must be dismissed.

Accordingly it is hereby ORDERED that:

1. Defendant's objection to the unsworn statements in support of plaintiff's opposition is sustained;

2. Defendant's objection to the handwritten notes on a copy of plaintiff's deposition is sustained;

3. Defendant's objections to plaintiff's medical records as unauthenticated and irrelevant are overruled; and,

4. Defendant's hearsay objection is overruled.

Further, it is hereby RECOMMENDED that:

1. Defendant's September 19, 2008, motion for summary judgment be granted;

2. Plaintiff's state law claims be dismissed without prejudice;

3. Judgment be entered in favor of defendant Dr. Penner on the federal question claims; and

4. The Clerk be directed to close the case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 15 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: September 21, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE